J. Leslie ASHER, Jr., and William R. Elmenhorst, Appellants,

v.

UNITED STATES of America, Appellee.

No. 21797.

United States Court of Appeals Ninth Circuit.

April 10, 1968.

10. The record shows that Gibeault was receiving $67 a week as unemployment compensation at the time he took this job.

James F. Hewitt (argued), Attorney-In-Charge, Legal Aid Society of San Francisco, San Francisco, Cal., for appellant.

Jerrold M. Ladar (argued), Asst. U. S. Atty., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before MADDEN, Judge of the United States Court of Claims, and MERRILL and CARTER, Circuit Judges.

MADDEN, Judge:

These are appeals, in forma pauperis, from convictions of the appellants, after a jury trial, in the United States District Court for the Northern District of California. The crime for which each appellant was convicted was the violation of § 2113(a) of Title 18, United States Code, which section defines, inter alia, robbery of a bank by intimidation, and § 2 of Title 18, United States Code, aiding and abetting one Paré in the robbery of a bank.

Evidence was received at the trial of the appellants which supports the following narrative of pertinent events. At about 4:30 in the morning of September 20, 1966, the appellant Elmenhorst, a cab driver, picked up Alan Paré, a 21 year old man, in the North Beach area of San Francisco. The two were well acquainted, having lived together previously. Paré told Elmenhorst that he was desperate for money at the time. Elmenhorst said that they could pull an armed robbery of a bank at 4th and Brannan Streets. They were at that time driving around the block in which that bank was located. Elmenhorst explained the layout of the bank to Paré, and said it would be an easy one to rob. Paré, said that the bank was "federal" and he did not want to get mixed up in a federal case. Elmenhorst said there had been five or six federal bank robberies in the last month and that no one had been caught. Elmenhorst had, sometime before, suggested to Paré that Paré rob a bank in San Mateo, California, but Paré had not followed that suggestion. An arrangement was made for Elmenhorst to pick Paré up at a designated place at about 1:30 p. m. on that same day. At about noon on that day, Elmenhorst contacted appellant Asher, who lived in an apartment in the same building in San Mateo in which Elmenhorst lived. Asher was a San Mateo policeman who was working a midnight to 8:00 a. m. shift. Elmenhorst invited Asher to ride into San Francisco with Elmenhorst and his wife, who was to be taken to a hairdresser. Asher accepted the invitation. Elmenhorst's wife was dropped off at her hairdresser's place, then Elmenhorst drove to the place where he had agreed to pick up Paré. Paré got into Elmenhorst's car at about 1:30 p. m. Asher had met Paré some months before in a bar and had seen him four or five times thereafter. Paré inquired of Elmenhorst why Asher was with him and Elmenhorst replied that Asher just wanted to come along and "maybe we'd need him."

There was discussion among the three men in the automobile concerning the robbing of a bank. All participated freely in the discussions. As we shall see, both appellants, Elmenhorst and Asher, urge that they did not take the discussions seriously. We discuss that question hereinafter. Paré's direct testimony was that he asked Asher what would happen to him if he got caught and that Asher said he would get eighteen months and a chance for a good education. It would have been natural for Paré to address that question to the policeman Asher rather than to the cab driver Elmenhorst. Paré's testimony as to the person to whom the question was addressed and the person who had answered it was shaken on cross-examination. Paré testified, without attributing the language specifically to either of the appellants, that they said that they had an alibi and it would not do Paré any good to "cop out."

The car then was driven by Elmenhorst to a Woolworth store. Elmenhorst gave Paré three dollars and directed him to buy a toy pistol and a notebook tablet, which Paré did. Then Elmenhorst dictated a suggested version of the note

which Paré was to hand to the teller in the bank to initiate the robbery. Paré discarded the Elmenhorst text and composed and discarded several versions, finally settling on the one he used. Then Elmenhorst drove to a grocery store where Paré obtained a bag in which to put the bank's money. Then they drove around the vicinity of the bank, looking for a hiding place for Paré after he had robbed the bank. Elmenhorst decided on an automobile which was standing in a parking lot in a block adjoining the block in which the bank was located. Elmenhorst unlocked that automobile with a wire coat-hanger and directed Paré to wait in it for Elmenhorst to pick him up after the robbery.

Elmenhorst and Asher then drove away and Paré proceeded to rob the bank by presenting a threatening note to the teller, holding the toy pistol, covered by his sweater, and indicating its presence to the teller. He obtained $1,121 in paper currency in the robbery. He ran to the pre-arranged hiding place in the automobile and waited there for the return of his companions.

Elmenhorst and Asher, after leaving Paré near the bank before the robbery, went to a bar a few blocks away, then to a bail bondsman, of whose secretary Elmenhorst made an inquiry. Then they went to the Hall of Justice, where Elmenhorst paid a parking ticket and arranged an appearance on another traffic violation. In the basement cafeteria there they had coffee, then drove back to Paré's hiding place, heard him whistle, stopped, and Paré got into the car with them. Paré exhibited the money which proved that he had robbed the bank. Elmenhorst ordered Paré to stay down in the back seat of the auto. They drove to the freeway. Elmenhorst said, "I knew you could do it." Asher asked him how much he got and he answered $700 or $800. Elmenhorst demanded the money and Paré gave it to him. Having left the freeway just before they got to San Mateo, Elmenhorst and Asher were talking about making Paré out to be a student so that they could pull off the road,

and Asher said, "I've got a perfect front, being a cop, you know." Paré's hair was shoulder length and Asher and Elmenhorst decided that he must have his hair cut. Asher objected to his being taken to his, Asher's, barber, but Paré objected to being taken to just any barber, saying, "I don't want to go to any, you know, crew cut cat, man, I want to go to a stylist." So they took him to Asher's barber.

An attendant at the parking lot in San Francisco where Paré had hidden after the robbery had discovered Paré sitting in the car in the lot and had told him he could not stay there. As Paré left that car to walk toward the street side of the lot he had dropped a bundle of $20 bills. The attendant called his attention to them, Paré retrieved them, walked on, and whistled. Elmenhorst's car stopped in the street and Paré got into it, as we have seen. The attendant made a note of the license number of Elmenhorst's car. The number was traced to Elmenhorst's San Mateo address, and the police and the FBI arrived there in the evening of the robbery at about 8:30 p. m. Elmenhorst and Asher were arrested at their apartments, $525 of the money, which Asher said he had hidden, at Elmenhorst's suggestion, in his garbage disposal unit, was turned over to the FBI; Elmenhorst went with the FBI to the shopping center in San Mateo where Paré was having his hair cut, and Paré was arrested there.

Paré, Elmenhorst and Asher were indicted in one count for the robbery of the bank. Paré, on November 7, 1966, pleaded guilty and was sentenced pursuant to §§ 5010(b) and 5017(c) of Title 18, U.S.Code, as a youth offender. In the trial of Elmenhorst and Asher, the prosecution's theory was that they aided and abetted Paré in the robbery, thereby becoming liable as principals under § 2 of Title 18, U.S.Code. That section says, in its subsection (a):

(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or

procures its commission is punishable as a principal.

## ELMENHORST

■■ Elmenhorst's activities, as recited above in this opinion, place him easily within the quoted provision. He suggested the robbery of the bank as the solution of Paré's financial stringency; he encouraged Paré to commit the robbery by telling him that bank robbery was a frequent occurrence and that bank robbers were seldom caught; he drove to San Francisco to help in the final arrangements for the robbery; he advanced the money and the idea for the purchase of the simple implements for the robbery; he supplied the idea of a near-by off-street hiding place for Paré after the robbery, and used his skill to unlock the parked car so that Paré could hide in it. It is hard to think how anyone could have been more intimately involved in this project without accompanying Paré into the bank, which Elmenhorst of course did not do. Elmenhorst's defense on the merits is that, in spite of all the steps preliminary to a bank robbery, in which steps he had been the principal actor, he did not expect, when he and Asher left Paré in the vicinity of the bank and drove away, that Paré would rob the bank. But the most that the jury could possibly have gathered from the evidence was that, although Elmenhorst had instigated and planned a robbery by Paré, Elmenhorst was still skeptical as to whether Paré would really proceed to try to rob the bank, or succeed if he did try. Since Paré did in fact rob the bank, the skepticism of Elmenhorst as to whether Paré would, or could, accomplish their joint objective did not mean that Elmenhorst had not aided and abetted the accomplishment.

Elmenhorst specifies several alleged errors committed by the trial court.

As we have seen, Elmenhorst's defense on the merits was that he had no idea that Paré was going to rob a bank. On that issue, a question of first-rank importance would be: What did Elmenhorst know, before Paré robbed the bank here in question, about Paré's proclivities for criminal activities and his capacity for robbing, by intimidation, an institution from which money could be obtained by robbery? Elmenhorst, having testified that he had no idea that Paré would or could rob a bank was asked, on cross-examination, whether he knew, before the day of the bank robbery, that Paré had robbed the Luxor Cab Company. Elmenhorst's answer was, "Yes, I knew." The question was proper and the answer was important. Elmenhorst gave further testimony indicating that he was not in town at the time of the Luxor robbery, that other cab drivers had told him about the robbery in a coffee shop. These statements, if allowed to stand uncontradicted, would have considerably weakened the effect of Elmenhorst's brief answer, "Yes, I knew," by indicating that he knew only by hearsay that Paré was capable of committing a robbery. The Government therefore wanted to show that Elmenhorst's knowledge of Paré's robbery of the Luxor Company was much more direct than his testimony had indicated. It wanted to ask Elmenhorst whether he had not said to Inspector Dyer of the Police Department that he had, on the occasion of the Luxor Cab robbery, sent Paré in to the cab company office. Elmenhorst's counsel objected. The court was troubled by the "other crimes" aspect of this line of questioning and proposed a rather roundabout line of questioning of the Inspector which would partially fulfill the Government's objective. Elmenhorst's counsel refused to stipulate to the court's proposed procedure. Then the court allowed the Government to ask Elmenhorst if he had not told Inspector Dyer that he knew of the Luxor Cab robbery because he had sent Paré in to the robbery. Elmenhorst denied that he had made the statement, and said that he had sarcastically said to Inspector Dyer that he had sent Paré in to rob the Queen Mary. When the Government proposed to question Inspector Dyer about Elmenhorst's statement to

him there was objection, but the court permitted the question, "During one of these conversations, did he state to you that he had sent Mr. Paré in to the Luxor Cab Company?" The Inspector's answer was "Yes."

Elmenhorst's brief asserts error in regard to the foregoing incident on account of (a) improper impeachment, and (b) no foundation.

■■ Although there was frequent mention of impeachment in the discussion between court and counsel before the Inspector took the witness stand, there was really no problem of impeachment. Whatever a party to a suit has said may be used against him by his adversary. If what he has said relates to an issue in the case, such as, in this case, Elmenhorst's knowledge of Paré's capacity to commit a robbery. Elmenhorst's statement showing such knowledge is substantive evidence that he possessed that knowledge. It may be proved, like any other fact, by cross-examination or by extrinsic evidence.

■■ Elmenhorst makes much of the fact that the questions and answers just discussed created an inference of criminality. So far as they attributed criminality to Paré, that was, of course, no concern of Elmenhorst. So far as the questions and answers about the Luxor Cab robbery attributed criminality to Elmenhorst, this is simply another instance in which evidence of the involvement of a defendant in a crime other than the one for which he is on trial is admissible if that involvement tends to prove, *inter alia,* knowledge and knowledge is an issue in the case on trial. In the instant case, knowledge by Elmenhorst of Paré's capacity to rob was the key issue in Elmenhorst's case. The evidence was clearly admissible in spite of its tendency to prejudice Elmenhorst in the mind of the jury.

Elmenhorst attributes error to a question of the prosecuting attorney addressed to Elmenhorst asking him whether Paré had any reason to testify falsely against him, Elmenhorst. The question was objected to, but Elmenhorst was allowed to answer, and went into a good deal of detail as to the fact that Paré was mad at Elmenhorst because the latter had led the police to Paré in the evening after the bank robbery. Then Government counsel asked Elmenhorst if he had not put the police on Paré in connection with the Luxor Cab robbery. This question was objected to as bringing in the subject of other crimes. It did not, of course, refer to other crimes of the defendants and was not objectionable on that ground. There were other developments in the trial relating to the Luxor Cab robbery, and we have discussed the "other crimes" problem in that connection.

■ Elmenhorst specifies as error that the court, over objection, gave an instruction on exculpatory statements to the effect that if a defendant voluntarily makes a statement tending to establish his innocence, which statement is later shown to be false, an inference of consciousness of guilt may be drawn by the jury from such evidence. Elmenhorst argues that there was no occasion for such an instruction because, although he at first told the police that he knew nothing about the robbery of a bank, he changed his story shortly thereafter and admitted that he knew all about the robbery. This prompt abandonment of his exculpatory statement might have a bearing on the weight which the jury should attach to it. But the instruction was proper. In our discussion of Asher's case, infra, we have also treated this problem.

We do not discuss Elmenhorst's criticism of the court's treatment, in its original instruction and its supplemental instruction, of the subject of what constitutes aiding and abetting in the law of crimes. The evidence as to Elmenhorst's part in the crime would make futile any discussion of delicate distinctions between being just inside and just outside the undefined line between aiding and abetting, *vel non*. Elmenhorst was, according to all the evidence, clearly inside the line. His defense is that he had no

idea that there was going to be a crime and for that reason he could not have intended to aid and abet the commission of a crime.

The indictment in this case charged that the defendants "took by force, violence and intimidation, a certain sum of money from a bank," etc. Elmenhorst asserts in this appeal that the prosecution failed to establish the *corpus delicti,* since it did not produce the teller of the bank to testify as to whether she was intimidated by Paré when she put the bank's money in his paper bag.

Counsel stipulated at the trial:

" * * * that the United California Bank, 4th and Brannan Street office, had a loss of $1,121 as a result of the actions of Alan Hugh Paré alleged in the above-entitled case, and that Exhibit 3 may be admitted into evidence in the trial of the above-entitled case."

Exhibit 3, of Miscellaneous Exhibits, is the typewritten statement of Alan Hugh Paré. This statement narrated the events of Pare's robbery of the bank.

The court's instructions to the jury included the following:

" * * * And the stipulation bears a date of January 9, 1967, and carries the signatures of all counsel, all three of the attorneys in the case. And, as I say, the facts stated in this stipulation are not open to question and are, for all purposes, conclusively established."

No question was raised at the trial about the validity or the effect of the stipulation. The *corpus delicti* question raised in this appeal has no merit.

### ASHER

■ In the foregoing part of this opinion we have discussed appellant Elmenhorst's case. We have said that on the evidence presented and which could rationally have been believed by the jury, Elmenhorst was deeply involved in the robbery of the bank, from the time that he suggested the robbery to the time that Paré was placed in the vicinity of the bank with the necessary implements for its perpetration. As to the appellant Asher, the situation is quite different. He did not come upon the stage until after it had been agreed between Elmenhorst and Paré that there was to be a robbery of a designated bank at approximately a specified time. When Elmenhorst brought Asher, known by Paré to be a policeman, to Elmenhorst's meeting with Paré to make the final preparations for the robbery, Paré was, naturally, suspicious and asked why Asher was there. Elmenhorst said, "We might need him." Then the discussion of the intended robbery began: the inquiry as to Paré's punishment if he should be captured; the alibis which Elmenhorst and Asher would have if Paré should be captured; the request of Paré for the use of Asher's gun in the robbery and Elmenhorst's prudent judgment that Paré should not have a lethal weapon; the necessity to provide Paré with a threatening note and a non-lethal simulation of a lethal weapon; and the provision of a hiding place where Paré would conceal himself after the robbery until he would be picked up by Elmenhorst and Asher. Asher heard and acquiesced in all of these decisions and took some part in the discussion. The jury could rationally have concluded that Asher's contention that he had no idea that a robbery or an attemped robbery was imminent was unbelievable. The discussion and the preparatory steps were not carried on in the spirit and mood of children playing a game of cops and robbers. They bore no resemblance to a game of make-believe.

■ Asher complains that the court did not adequately instruct the jury on the subject of aiding and abetting when the jury returned to the court for further instructions after it had begun its deliberations. Specifically, what Asher complains of is that the jury was not *re-instructed* on aiding and abetting in the supplemental instruction which the court gave in response to the jury's inquiry. The jury's question was, "Is there a verdict that we can give that

would be 'Guilty after the fact, or guilty as accessory after the fact' ?" Before the jury was called back to receive the answer to its inquiry, the court and counsel considered in detail what the answer should be. It was agreed that, the charges against the defendants being what they were, the jury could not bring in such a verdict as its inquiry suggested. The court said, "and then I'm going to read the standard instruction on aiding and abetting." When the jury was called in, the court answered its question about "guilty after the fact," and then discussed at considerable length the concept of aiding and abetting, the crime with which the defendants were charged. In addition, as we have seen, the court had, in its original charge to the jury, specifically and in detail instructed on aiding and abetting. We think it was quite unnecessary for the court in the supplemental instruction to again discuss aiding and abetting, which was not the problem raised by the jury's inquiry. The court in its supplemental instruction said nothing that was inconsistent with its original instruction on aiding and abetting, or inconsistent with good law. Our conclusion is that the jury was both instructed and re-instructed on the subject of aiding and abetting and that there was no error in that regard.

■ Asher complains because the trial court instructed the jury on the significance of exculpatory statements by a defendant, which statements are later proved to be false. The instruction included this language:

> "It is reasonable to infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence."

In the discussion concerning instructions which the court was proposing to give, counsel for Asher, urging that the proposed instruction on exculpatory statements not be given, said that there was no evidence of any exculpatory statements, and referring to Elmenhorst's first answer to police inquiry about a bank robbery, "I don't know anything about it," argued that because Elmenhorst, within a matter of minutes, admitted that he knew a great deal about the robbery, his prior statement was not exculpatory. Counsel's position was wrong as to Elmenhorst. If counsel had urged that Asher had not made any exculpatory statement, the court might have given special attenion to that argument. The instruction as given contained this language:

> "Whether or not evidence as to a defendant's voluntary explanation or statement points to a consciousness of guilt, and the significance, if any, to be attached to such evidence, are matters for determination by you, the jury."

If, as seems to have been the fact, there was no exculpatory statement within the meaning of the applicable rule on the part of Asher, it is hard to see in what manner the jury could have misused the instruction. We do not resolve the question, raised for the first time on appeal, that exculpatory statements, to come within the rule, must be extra-judicial to the instant lawsuit.

The judgment is affirmed as to each defendant.