UNITED STATES of America,
Plaintiff–Appellee,

v.

James Donald SMITH,
Defendant–Appellant.

No. 86–1351.

United States Court of Appeals,
Tenth Circuit.

Nov. 9, 1987.

Rufus O. Wilderson, Denver, Colo. (Thomas P. Johnson, Mayer, Brown & Platt, Denver, Colo., was also on the briefs), for defendant-appellant.

Catherine M. Goodwin, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., Denver, Colo., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and SAFFELS, District Judge[*].

HOLLOWAY, Chief Judge.

Defendant, James Donald Smith ("Smith"), was convicted by a jury on two counts of possession of goods stolen from interstate commerce in violation of 18 U.S. C. §§ 659 and 2 (1982). On appeal, Smith argues that the trial court erred by admitting four tape recorded conversations, and transcripts of them, between his wife and a government informant in evidence under the coconspirator's statement exception of Fed.R.Evid. 801(d)(2)(E). We affirm.

## I.

### A. Preindictment proceedings

Considered in the light most favorable to the government, as it must be after the guilty verdict, the evidence tends to show the following. Between December 27, 1984 and January 24, 1985, two IBM personal computers were stolen from the Continental Airlines freight and baggage storage area at Stapleton International Airport in Denver, Colorado. The first computer was part of a larger shipment of computers in transit from California to Washington, D.C. that had been held over in Denver between December 27, 1984 and January 1, 1985. When the shipment had first arrived in Denver, inventory was taken; when it finally arrived in Washington and was re-inventoried, one computer was missing. The second computer, which was taken on January 24, 1985, belonged to a passenger on Continental Airlines. The computer had been shipped as part of the passenger's personal baggage and failed to appear for pick-up with the rest of his luggage.

At the time the two thefts occurred Smith was employed by Continental as a member of the airplane towing crew. In December 1984, members of the towing crew were responsible only for towing planes to and from the airport gates. In early January 1985, however, they were assigned the additional duty of helping to load and unload the aircraft. Members of the towing crew—as well as most other Continental employees—had access to the freight and baggage storage area.

[*] The Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

Smith was not working on December 27, 1984, the day the computer shipment from which the first computer was taken arrived in Denver. However, he did work several of the days during which the computer shipment was being stored in Denver. Smith was not working on January 24, 1985, the day the second computer was missed.

It was never discovered who actually took the computers. When his wife, Mary Grace Smith ("Grace"), attempted to sell the two computers to several of her co-workers at the Internal Revenue Service in January and February, 1985, however, suspicion centered on Smith. Nonetheless evidence of a link to Smith was only circumstantial. When Grace's co-workers inquired about the source of the computers, Grace responded at various times that they were from "a friend that was a distributor," III R. 11 (testimony of Mr. Tanner); "a computer salesman, or representative," III R. 41 (testimony of Mr. Sanborn); "someone who was in retail sales or was a salesman," III R. 83 (testimony of Mr. Askew); and "somebody who worked with Mr. Smith," V R. 14 (testimony of Mr. Phelps).

Although at least one of Grace's co-workers, Mr. Askew, declined to purchase one of the computers because of the suspiciously low price, Grace eventually sold both of the computers. The first computer was sold to a co-worker on February 12, 1985, after he inspected it at Smith's home. The second computer was sold from Smith's home to another co-worker on March 8, 1985. The purchase price of each computer was $400, although the retail value of such computers was between $2,500 and $3,000. The proceeds were deposited by Grace in her personal bank account. Smith was not present during any of the sale transactions. When the price for the first computer was being negotiated, however, Grace at one point commented that "she would have to call [Smith] and have him get ahold of the distributor and check with him if that price would be okay." III R. 14.

In June 1985 Askew, the I.R.S. employee who had initially decided not to purchase a computer from Grace, was approached by an inspector with the I.R.S. and asked to attempt to acquire a computer from Grace. Askew agreed. Between June 4 and June 11, Askew recorded a series of conversations with Grace in which he inquired into the availability and the source for the computers. Although Grace initially identified the source as a "salesman for the [computer] company," I Supp.R. document 1, at 4–5, she implied, somewhat equivocally, that Smith was somehow involved in the acquisition process. On June 4, for instance, Askew asked if he Grace might know by the next day about the availability of a computer and its price. Grace responded:

GRACE: If [Smith] comes home tonight . . .

ASKEW: Uh-huh.

GRACE: . . . cause he's got a meeting . . .

ASKEW: Uh-huh.

GRACE: . . . uh, early . . .

ASKEW: Uh-huh.

GRACE: . . . I could probably get some information for you . . .

I Supp.R. document 1, at 7–8. And in a conversation on July 11, Grace implicated her husband again:

ASKEW: Okay, do you, okay, do you have any idea when you might hear something?

GRACE: I can check into it. James will pick me up tonight.

ASKEW: He's going to pick you up?

GRACE: Yeah.

ASKEW: Are you doing James, James is the one? So, with leaving James, you're gonna lose your contact, aren't you (unintelligible).

GRACE: Probably.

I Supp.R. document 4, at 3–4.

On the strength of the tape recorded conversations, a Federal Bureau of Investigation agent, Rose, questioned Smith about the thefts on October 7, 1985. In response to questions about how two computers stolen from Continental came to be sold by Grace, Smith denied any knowledge of the computers, stating that he "wasn't aware

that his wife had ever had any computers ... wasn't aware that his wife had ever sold any computers [and] ... had not seen any computers in his home." III R. 62. Three days later, on October 10, Rose again questioned Smith, this time while Grace was present. At that session, Smith claimed that he believed the computers had been misdelivered by either the Postal Service or U.P.S. In addition, he suggested that Continental was "setting him up," III R. 65, and that the I.R.S. "made his wife [sell] the computers." *Id.* Finally, on November 21, after Smith's arrest, Rose interrogated Smith for a third time. When questioned about the computers, Smith "insisted that the computers found at his home had been left there on the front step." III R. 67.

### B. Pretrial Proceedings

Smith and Grace were indicted on two counts of theft of goods from interstate commerce in violation of 18 U.S.C. §§ 659 and 2 (1982). A superseding indictment charged instead two counts of possession of goods stolen from interstate commerce in violation of 18 U.S.C. §§ 659 and 2 (1982).

On May 14, 1986, a hearing was held to consider several pretrial motions. First, motions by both Smith and Grace to sever were granted on the ground that their defenses were antagonistic. Then, the court turned its attention to Smith's motion for a *James* hearing, *see United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), to determine whether the taped conversations between Grace and Askew should be admitted as "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

In arguing that the tapes were inadmissible hearsay, Smith contended that the evidence failed to show by a preponderance that a conspiracy existed. Alternatively, he argued that any existing conspiracy had ended in March with the sale of the second computer, three months before the conversations between Grace and Askew took

place. Therefore, he insisted, the evidence was inadmissible under Fed.R.Evid. 801(d)(2)(E). The government, on the other hand, claimed that evidence of an existing—and continuing—conspiracy was sufficient to meet the preponderence of the evidence test. It introduced evidence that: (1) two computers were stolen from the Continental storage area in Denver; (2) Smith was employed by Continental and had access to the computers during the time they were stolen; (3) Smith's wife, Grace, sold the two computers from their home to two of her co-workers at the I.R.S. in Denver; (4) Grace and Smith lived together before, during and after the thefts and sales of the computers; and (5) Smith admitted he saw the computers in his home.

After considering the testimony presented at the *James* hearing, the trial court agreed with the government:

[B]ased only ... on independent evidence [other than the tapes themselves] I find that the preponderance of the evidence ... shows that the defendant, James Donald Smith, was employed by Continental Airlines, and through his employment there had access to the goods that were allegedly stolen goods.

I further find that Mr. Smith has admitted that he saw two computers at his home which he shared with co-defendant Mary Grace Smith.

I find that they were, at the appropriate times involved in this case, married and living together in a very close and confidential relationship.

And I further find that the government produced evidence that Mrs. Smith actually engaged in acts of selling without reference to her statements that are in dispute here. . . .

And further, there is independent proof that the source of those stolen computers is the defendant James Donald Smith's employer, Continental Airlines.

And from those facts ... I find and conclude that at the times in issue a conspiracy did exist; that both defendants in this case were members of that

conspiracy, and that the statements in issue were made during the course of and in furtherance of the conspiracy. II R. 56. As a consequence, the trial court ruled that the taped conversations between Grace and Askew were admissible at trial under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).

### C. Trial Proceedings

At trial, Smith sought to show that the acquisition and sale of the two computers could have been performed by Grace without Smith's knowledge or assistance. Grace was portrayed as an "independent woman ... in her marital relationships...." V R. 11. One witness testified that Grace had been involved in at least two extramarital affairs, V R. 4, 6–7, and another witness agreed that Grace had "many friends and acquaintances of her own that she did not share with her husband." V R. 13. Likewise, Smith himself testified as to Grace's personal independence. Not only did he grudgingly acknowledge Grace's marital infidelity and her separate friends, but he noted that during the time period at issue, Grace had her own job, her own automobile, and her own personal bank account.

In addition to attempting to show that Grace could have acted without him, Smith also strove to minimize the damage created by the differing stories he had given when questioned about the appearance of the computers in his home. To begin with, he disputed Rose's version of his statements when he was first questioned on October 7, noting that Rose's written statement of the interview said nothing about Smith denying that he had seen any computers in his house. And while he admitted making false exculpatory statements on October 10 and November 21, he insisted that they had been motivated by a desire to protect Grace. Further, Smith presented a new explanation of the events surrounding the appearance of the computers in his home. He testified that the boxes containing the computers had been in the house when he came home from work one evening, and

when he inquired about them, Grace told him that they had been left on the front porch by U.P.S. or some other delivery service. His response, he claimed, was to tell Grace to "try and find out what she could ... about them ... [and] if she couldn't find out who they belonged to, just [to] get rid of them...." IV R. 24–25.

In addition to asserting a vigorous defense, Smith also renewed at trial his earlier objection to the admission in evidence of the tape recordings and transcripts of the conversations between Grace and Askew, arguing that there was no evidence "of the existence of a conspiracy and Mr. Smith's participation in that conspiracy in June and July of 1985...." III R. 78. Again, the court disagreed:

> Well, it appears to me [that] the fact they were still married at a later time, and thus at both times married and at least living together some of the time, indicates a very close ongoing basic relationship which would make it unlikely that she could be carrying on this kind of a business without his at least knowing about it and participating in some way as a cooccupant of the same house, and of the same marriage, and thus it appears to me that [the tape recordings] are relevant, because it appears to me that they are evidence of the same conspiracy continuing to the later date.

III R. 79.

The jury returned a verdict of guilty on both counts of possession of goods stolen from interstate commerce, and following judgment of conviction and sentence, Smith appeals.

### II.

On appeal, Smith contends that the government failed to demonstrate by a preponderance of the evidence that Smith was a member of any conspiracy to possess goods stolen from interstate commerce. Consequently, Smith argues the trial court erred in admitting the four tape recorded conversations[1] between Grace and Askew

---

1. Smith's hearsay objection appplied equally to the tape recordings and to the transcripts of the

under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). In addition, he argues the related points that (1) the recorded conversations were not made in the scope of and in furtherance of any conspiracy with him; and (2) the government failed to establish by a preponderance of independent evidence that a conspiracy existed at the time the conversations took place.

## A. Evidence that Smith was a Member of the Conspiracy

■ In arguing that the government failed to prove his involvement in a conspiracy to possess the stolen computers, Smith does not deny the existence of the conspiracy itself. Rather, Smith asserts only that there was insufficient evidence linking him personally to the conspiracy. *See e.g.,* Brief of Appellant at 8 ("Certainly Grace conspired with someone, but the evidence, independent of her hearsay statements, does not prove that [Smith] was the person.") (emphasis omitted). According to Smith, the only evidence of his participation in the conspiracy was the logical inference to be drawn from the facts that (1) he worked for the carrier from which the computers were stolen; and (2) he was married to the woman who sold them. However, Smith contends, this wholly circumstantial evidence was substantially weakened by testimony showing that Grace lived an independent lifestyle, and by evidence of widespread access to the Continental storage area. When these facts are viewed in their proper context, Smith claims, it was just as conceivable that Grace acted in concert with one of Smith's co-workers as it was that she conspired with Smith.

■ We cannot agree. In our view, the government presented sufficient evidence from which to infer that Smith was a knowing participant in the conspiracy to possess the stolen goods. To begin with, the circumstances, by themselves, provide some evidence that he was a member of the conspiracy. It was undisputed that the computers were stolen from Smith's place of employment; they were in Smith's home

—and Smith was aware of their presence— for at least two weeks; and they were sold by Smith's wife, who lived in the house with Smith. The critical element necessary to link Smith to the conspiracy, therefore, was evidence that Smith knew the computers in his home were stolen. And we believe that Smith's awareness that the computers were stolen could be inferred from their presence in his home. Possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which an inference may reasonably be drawn that the person knew the property had been stolen. *United States v. Wilson,* 523 F.2d 828, 830 (8th Cir.1975), *cert. denied,* 434 U.S. 849, 98 S.Ct. 158, 54 L.Ed.2d 117 (1977); *see also Barnes v. United States,* 412 U.S. 837, 843, 93 S.Ct. 2357, 2361, 37 L.Ed.2d 380 (1973). *Accord United States v. Ferro,* 709 F.2d 294, 297 (5th Cir.1983). Consequently, we feel that the undisputed facts of the present case would be sufficient, without more, to prove by a preponderance of the evidence that Smith conspired with Grace to unlawfully possess the computers.

However, the trial court did not need to rely solely on that evidence, as other facts indicated Smith's complicity. For instance, Smith made false exculpatory statements on at least two, and possibly three, occasions when he was interrogated by the FBI. A false exculpatory statement will support an inference of consciousness of guilt. *Asher v. United States,* 394 F.2d 424, 429 (9th Cir.1968). *Cf. United States v. Soundingsides,* 825 F.2d 1468, 1471 (10th Cir.1987) (denial of petition for rehearing en banc) (per curiam). Moreover, when negotiating the sale price of one of the computers, Grace said that "she would have to call [Smith] and have him get ahold of the distributor and check with him if that price would be okay." III R. 14. While Grace's statement may have supported Smith's contention that he was not the ultimate source of the stolen computers, it still implicated him in the conspiracy to possess the goods by indicating his direct involvement in the conspiratorial activ-

conversations. For convenience, we refer only to the tape recordings.

ities. Finally, Smith told an FBI agent that one of Grace's co-workers at the IRS, Donald Hudson, had called Smith directly to see if he could supply Hudson with a computer. Although Smith's response to the inquiry was disputed—the FBI agent testified that Smith stated that his response to Hudson was " 'maybe,' he would have to look into it," III R. 65–66, while Smith testified that he told Hudson "that [Hudson] would have to talk to [Smith's] wife," IV R. 35—both versions of the conversation demonstrated Smith's awareness of Grace's illegal activities. Consequently, we conclude that the trial court was not clearly in error in finding by a preponderance of the evidence that Smith was a member of a conspiracy to possess goods stolen in interstate commerce.

## B. Evidence that the conversations were in furtherance of the conspiracy

Smith's second argument, that the recorded conversations were not made in furtherance of the conspiracy, can be quickly resolved. Statements by a conspirator are in furtherance of the conspiracy when they are "intended to promote the conspiratorial objectives." *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir.1986). For instance, statements that explain events of importance to the conspiracy in order to facilitate its operation are considered to be in furtherance of the conspiracy. *Id.* Similarly, "[s]tatements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy further the ends of the conspiracy...." *United States v. Gomez*, 810 F.2d 947, 953 (10th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987); *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir.), *cert. denied, sub nom. Stillman v. United States*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). More particularly, "[s]tatements of a coconspirator identifying a fellow coconspirator are considered to be made in furtherance of the conspiracy." *United States v. Handy*, 668 F.2d 407, 408

(8th Cir.1982); *United States v. Williams*, 604 F.2d 1102, 1113 (8th Cir.1979).

It is clear that the conversations between Grace and Askew were in furtherance of the conspiracy. Indeed, from Grace's perspective, the sole purpose of the conversations was to promote the conspiracy's unlawful objectives, *Reyes*, 798 F.2d at 384, by selling an illegally acquired computer to Askew. During Askew's first recorded conversation with Grace, for instance, Askew inquired whether Grace "still [had] access to any of those computers?" I Supp.R. document 1, at 4. Her response seemed designed to whet Askew's interest in acquiring a computer, thus advancing the conspiracy:

GRACE: All of 'em.

ASKEW: You still have 'em?

GRACE: Yeah.

ASKEW: Where can you get 'em?

GRACE: In fact, I just got rid of one.

ASKEW: You just did? What'd you get ...

GRACE: It had a three ... piece complete set Apple he wanted six hundred for.

I Supp. R. document 1, at 4. Moreover, aspects of the conversation were specifically designed to lull Askew's suspicions that the computers were stolen. When Grace described the sale of a $2,600 machine for $400 to Askew, the following conversation took place:

ASKEW: Jesus H. Chri, are you sure this stuff's not hot, Grace?

GRACE: No, it's not.

ASKEW: You know it's not hot.

GRACE: I know it's not. I know he works for the company.

I Supp.R. document 1, at 6–7. This conversation was unquestionably intended to "provide reassurance" to Askew. *Gomez*, 810 F.2d at 953.

Finally, the conversations between Grace and Askew in which Grace discussed Smith's role in the conspiracy acted to "identify a fellow conspirator...." *Handy*, 668 F.2d at 408. As such, they tended to further the conspiracy. Consequently, we hold that the finding that the

conversations were made in furtherance of the conspiracy was not clearly erroneous. *Id.*

### C. Evidence that the conversations occurred during the course of the conspiracy

Smith's final argument—that the conversations did not occur during the course of the conspiracy—is more troublesome. In essence, Smith asserts that a conspiracy terminates either when the last overt act is performed, *see Fiswick v. United States,* 329 U.S. 211, 216–17, 67 S.Ct. 224, 227–28, 91 L.Ed. 196 (1946), or when the central aim of the conspiracy had failed or was achieved. *See Krulewitch v. United States,* 336 U.S. 440, 442–43, 69 S.Ct. 716, 717–18, 93 L.Ed. 790 (1949); *United States v. Silverstein,* 737 F.2d 864, 867 (10th Cir. 1984). Smith contends that the central purpose of the conspiracy was to illegally obtain two IBM computers from Continental, and then to sell them to Grace's co-workers at the IRS. Under either test, therefore, Smith claims that the conspiracy necessarily terminated in March 1985, when the last of the stolen computers was sold. On that date, the central aim of the conspiracy—to steal and sell the two computers—was achieved. Likewise, no evidence was introduced of any additional overt action by either Smith or Grace. As a result, Smith concludes, the conspiracy ended on March 8, 1985.

The government, on the other hand, argues that the circumstances of the conspiracy indicate that the conspiracy was not merely to illegally possess and sell two IBM computers. Rather, the government suggests, the circumstances and duration of the conspiracy imply that the purpose of the conspiracy was to illegally possess and sell stolen computers. Consequently, although the conspiracy was quiescent for three months, it had not terminated. Therefore, the trial court was correct in concluding that the conspiracy continued through June 1985.

Although we believe it is a close question, we uphold the trial court's findings. The question of when a conspiracy terminates "is a question not always free from doubt." J. Weinstein & Berger, 4 *Weinstein's Evidence* § 801–252 (1987). "The time at which [a] conspiracy ends depends upon the particular facts of the case." *Silverstein,* 737 F.2d at 867; *Woodring v. United States,* 367 F.2d 968, 969 (10th Cir. 1966). "Generally, ... a conspiracy terminates when its central criminal purposes have been attained." *Silverstein,* 737 F.2d at 867; *Krulewitch,* 366 U.S. at 442, 69 S.Ct. at 717. The question whether the conspiracy terminated in March 1985 hinges on its "central criminal purpose." If the conspiracy's purpose was to illegally possess and steal only two IBM computers, as Smith maintains, then that goal was achieved in March 1985. However, if the conspiracy's aim was to illegally possess and sell computers, as the government suggests, then an inference that the conspiracy was still in existence in June 1985 appears reasonable, despite the absence of any overt activity between March and June 1985. "The fact that the conspiratorial object was postponed or slowed down does not unequivocally show that the conspiracy was terminated." *United States v. Smith,* 578 F.2d 1227, 1237 (8th Cir.1978) (Lay, Circuit Judge, concurring).

The specific circumstances of the present case support the government's position that the conspiracy's purpose was not limited to acquiring and selling two IBM computers. First, and most importantly, two computers were stolen. While one theft may not give rise to a inference of a continuing conspiracy, recurring illegal activity supports such an inference. Moreover, in this case, the time period between the first and second theft was from three to four weeks. This length of time effectively refutes any contention that the two thefts were part of a short-lived scheme. Next, Grace's efforts to sell the computers lend credence to an expansive interpretation of the conspiracy. At various times, at least seven people visited Smith's residence with an eye toward purchasing one of the stolen computers. III R. 11; III R. 43. Furthermore, Grace approached at least two other people offering to sell them a computer. III R. 82–83; V R. 13–14. In

addition, the evidence indicated that it was widely known at Grace's office that she had computers for sale. III R. 10; III R. 43. A third characteristic that suggests a continuing conspiracy is the length of time it was in operation. The first theft took place in late December or very early January 1985. The second theft occurred in late January. One computer was sold during February, and the other computer was sold on March 8. When conspiratorial activity takes place for some two months, as is true here, a hiatus of less than three months may support an inference of a breathing spell rather than a termination of the conspiracy.

In sum, the trial court's finding that the statements were made during the course of the conspiracy was not clearly erroneous.

### III.

There is an additional ground on which we are convinced that the ruling of the trial judge admitting the tape recordings should be upheld. While the judge's findings in the *James* hearing were made solely on the basis of the independent evidence of conspiracy, it seems clear that the judge at trial considered the tapes themselves as relevant to the issue of their own admissibility. III R. 78–79. We feel the trial judge's consideration of the tapes for purposes of that evidentiary ruling was proper; and that the tapes, when considered with the independent evidence, demonstrate that the judge correctly overruled Smith's hearsay objection.

At trial Smith strenuously reasserted his hearsay objection to the tapes of the June and July 1985 conversations between Grace and Askew, arguing that no conspiracy during the latter period had been shown. III R. 77–78. The trial judge addressed the hearsay objection directly saying that it appeared the defendant and Grace were still married at a later time, and had a close ongoing relationship. Consequently, the trial court found it unlikely that Grace was carrying on the business without defendant's "at least knowing about it and participating in some way as a cooccupant of the

same house, and of the same marriage ..." The judge concluded:

> and thus it appears to me that [the transcripts of the June and July Askew–Grace phone conversations] are relevant, *because it appears to me they are evidence of the same conspiracy continuing to the later date.*

III R. 79 (emphasis added).

We hold that the trial judge correctly considered both the tapes and the independent evidence to determine their admissibility. Furthermore, we find that his ruling admitting the tapes under the coconspirator exception to the hearsay rule was correct. Since Smith's trial, there have been significant opinions rendered which clearly support the trial judge's rulings. In *Bourjaily v. United States*, — U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Supreme Court held that the preliminary facts relevant to the Rule 801(d)(2)(E) exception, when disputed, must be proven by a preponderance of the evidence, *id.* at ——, 107 S.Ct. at 2778, and that under Fed.R.Evid. 104(a):

> a court, in making a preliminary factual determination under rule 801(d)(2)(E) may examine the hearsay statements sought to be admitted.... the judge should receive the evidence and give it such weight as his judgment and experience counsel.

— U.S. at ——, 107 S.Ct. at 2782. The Court made it explicitly clear that it did not decide whether the courts could rely solely on the hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence. *Id.*

In light of *Bourjaily*, the trial judge's inclusion of the tapes and transcripts as part of the evidence on which to make his findings was proper. *See also United States v. Hernandez*, 829 F.2d 988, 993–994 (10th Cir.1987); *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir.1987). Moreover, in view of all the evidence recited we are satisfied that the findings of the trial judge on which he premised the admission of the tape recorded conversations were not clearly erroneous, which is the standard we must follow in assessing the

findings. *Bourjaily,* —— U.S. at ——–——, 107 S.Ct. at 2780–83.

## IV.

We hold that the trial court committed no error in the evidentiary rulings which are appealed and accordingly the judgment is

AFFIRMED.