FILED
United States Court of Appeals
Tenth Circuit

January 22, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TERRENCE RUTLAND,

Defendant-Appellant.

No. 11-8049

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 1:10-CR-00077-WFD-1)**

---

Megan L. Hayes, Corthell and King, P.C., Laramie, Wyoming, for Appellant.

Jason M. Conder, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, and Stephanie I. Sprecher, Assistant United States Attorney, Casper, Wyoming, with him on the brief) Lander, Wyoming, for Appellee.

---

Before **O'BRIEN**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Does the operation of a drug business out of your home involve interstate commerce? In this case, Terrence Rutland was convicted in federal district court on robbery, narcotics, and firearm charges. Rutland contends his federal

conviction for robbery and use of a firearm during a violent felony are invalid, arguing that the robbery of a drug dealer at his home did not interfere with interstate commerce because the dealer was not engaged in a business. Rutland also claims the district court erred by admitting numerous out-of-court statements as coconspirator statements when there was insufficient evidence of a conspiracy.

We conclude a drug dealer's home business is part of interstate commerce, and the jurisdictional provisions of the Hobbs Act, 18 U.S.C. § 1951, apply to Rutland's crimes. We also find no reversible error in the district court's evidentiary rulings. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM Rutland's convictions.

# I. Background

Charles Jerabek, a drug trafficker in Rock Springs, Wyoming, was robbed in his home of cash, drugs, a gun, and a few other personal items. He did not initially report the robbery to authorities. But a few months after the robbery, Jerabek was arrested in connection with a methamphetamine trafficking investigation and began cooperating with the authorities. Jerabek informed the police of the robbery at this time. Rutland soon became a suspect in the robbery.

Following further investigation, numerous individuals in Rock Springs, including Rutland, were arrested and charged in connection with the meth trafficking investigation. Rutland was charged with (1) conspiracy to possess with intent to distribute, and to distribute, methamphetamine, 21 U.S.C. §§ 841 &

846 (Count One); (2) interference with commerce by threats or violence (the robbery charge), 18 U.S.C. § 1951 (Count Two); (3) carrying a firearm during a drug trafficking crime, 18 U.S.C. § 924(c)(1) (Count Three); and (4) use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1) (Count Four). In the conclusion to his opening brief, Rutland requests that we remand his case for a new trial on Counts One and Three, but this is the only time he mentions a challenge to these convictions. Because the only arguments Rutland raises on appeal pertain to Counts Two and Four, we do not review the propriety of his narcotics convictions.

The evidence against Rutland on the robbery charge consisted almost entirely of the testimony of numerous eyewitnesses and acquaintances. Much of the testimony was conflicting, and, as Rutland's counsel established during trial, many of the government's witnesses were also facing charges and had entered plea agreements with the prosecution in exchange for their testimony. That testimony tended to establish the following.

Jerabek, a meth dealer in Rock Springs, was at his home using drugs several days before Christmas in December, 2008. Very early in the morning, between 2:30 a.m. and 5:00 a.m., Jerabek heard someone kick in his front door. He confronted the intruder, who was wearing a bandanna over his face and carrying a pistol. The intruder yelled, "Where is it?" and then either hit Jerabek with his gun, which caused it to discharge into the wall, or shot Jerabek, grazing

-3-

the side of his head. R., Vol. 3, at 221. In either case, Jerabek suffered a head injury and lost consciousness. The robber then took a significant quantity of cash and drugs, a gun, and a few other items and fled.

Jerabek did not report the robbery to police or seek treatment for his head injury because he feared the authorities would discover his meth trafficking. He was unable to leave his house for several weeks because he experienced dizziness and other symptoms resulting from his injury. As a result, he could not obtain drugs to sell, and was unable to operate his drug business for roughly two months.

Witness testimony revealed that a number of individuals associated with the Rock Springs meth trade discussed robbing Jerabek in the months prior to the incident. These discussions started when John McIntosh, the brother of Rutland's girlfriend, complained to David Burnett, another meth dealer and a competitor of Jerabek's, that Jerabek had McIntosh's gun. McIntosh had sold the gun to Jerabek but now wanted it back. Burnett also harbored a grudge against Jerabek, after Jerabek sold him low-quality drugs and borrowed money from him without repaying it. Burnett offered to help McIntosh repurchase the gun, but Jerabek refused to return it.

McIntosh and Rutland, who sold drugs for Burnett and also was his roommate, decided they would retrieve McIntosh's gun by force. They went to Jerabek's house but called off their plan when they found Jerabek's girlfriend, Laurie Hundley, there with Jerabek. After this aborted attempt, Rutland,

McIntosh, Burnett, and another acquaintance, Daniel O'Connell, continued to discuss robbing Jerabek to retrieve McIntosh's gun, and possibly other items.

Michael Medved, the son of Jerabek's girlfriend, overheard some of these conversations. Medved once purchased drugs from Jerabek but began buying from Burnett after he and Jerabek had a disagreement. Medved asked the men to warn him before they robbed Jerabek so he could remove his mother from Jerabek's house.

The day of the robbery, Rutland, Rutland's girlfriend, and Burnett were discussing the crime. Rutland told Burnett he was going to do it. Burnett offered to help him, but eventually went elsewhere.

Also the day of the robbery, either Rutland or Burnett called Medved and told him "tonight's the night." R., Vol. 3, at 376–77. Medved then arranged to take his mother to visit friends in a nearby town. He dropped her off there and then left about 4 a.m., returning to his girlfriend's apartment in Rock Springs.

Early the next morning, Burnett was awoken by Rutland, who told Burnett he had robbed and possibly shot Jerabek. Burnett told Rutland he could not stay with him, and then called O'Connell, who helped Rutland find a hotel room. Burnett then found Medved and told him what had happened. He also told Medved that Rutland would pay him to keep quiet about the robbery. Rutland later gave Medved $2000 in cash.

Later that day, Burnett, Rutland, Medved, and several others convened in Rutland's hotel room. Ricky Campbell, a friend of Rutland's, arrived and gave Rutland a gun. After the robbery, Rutland had thrown his gun into a snowdrift and later asked Campbell to retrieve it. Rutland then asked Jesse Winner, another of Burnett's meth dealers, to dispose of several bags containing the gun, the clothes Rutland wore during the robbery, and a few other things taken from Jerabek, including a photo album. Winner later burned these bags in his backyard.

Rutland then told Burnett he was going to leave town for a while. He gave Burnett the cash and drugs he had stolen from Jerabek for safekeeping. Burnett claimed he received $24,000 in cash and about half a pound of meth from Rutland. Rutland was later apprehended and charged for crimes arising from his involvement in the robbery, as well as his participation in Burnett's meth trafficking operation.

At trial, the testimony pertaining to Jerabek's robbery included numerous out-of-court statements. Rutland objected to these statements as hearsay. The district court provisionally admitted them as coconspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) after the government claimed it would introduce evidence establishing the existence of a drug conspiracy and a

conspiracy to rob Jerabek.[1]  The court later found the existence of both conspiracies had been established, although it did not identify which specific pieces of evidence supported its finding or which statements were admissible pursuant to which conspiracy.

## II.  Discussion

On appeal, Rutland argues the district court lacked jurisdiction to prosecute him for robbery.  Rutland was prosecuted under the Hobbs Act, 18 U.S.C. § 1951, which makes it a federal crime to interfere with interstate commerce by force or threats.  Rutland argues there was an insufficient nexus between Jerabek's robbery and interstate commerce to support his Hobbs Act conviction.

We review de novo whether Rutland's robbery satisfies the jurisdictional prerequisites of the Hobbs Act.  *United States v. Buffey*, 899 F.2d 1402, 1407 (4th Cir. 1990).  To the extent Rutland challenges the sufficiency of the evidence supporting the jury's verdict that he is guilty of a Hobbs Act offense, we still review the verdict de novo but construe the evidence and all reasonable inferences therefrom in the light most favorable to the government.  *United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009).

---

[1] Neither the defense nor prosecution asked for a *James* hearing.  *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (holding a trial court should not allow a jury to hear out-of-court coconspirator declarations before holding a hearing, outside the jury's presence, to determine whether such statements are admissible under Federal Rule of Evidence 801(d)(2)(E)).

Rutland also challenges the district court's decision to admit numerous out-of-court statements. He argues there was insufficient evidence to establish the existence of a conspiracy to rob Jerabek and contends the statements were not admissible pursuant to any other exception to the hearsay rule.

We review the district court's decisions admitting or excluding evidence for an abuse of discretion. *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993). We review any findings of fact underlying these decisions, such as whether a conspiracy existed or whether certain statements were made in furtherance of the conspiracy, for clear error. *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996).

### A. *Hobbs Act*

The Hobbs Act makes it a federal crime to obstruct, delay, or affect "commerce or the movement of any article or commodity in commerce, by robbery or extortion. . . ." 18 U.S.C. § 1951(a). Normally we require the government to show a robbery had at least a *de minimis* impact on interstate commerce to satisfy the commerce element of a Hobbs Act offense. *United States v. Bolton*, 68 F.3d 396, 398 (10th Cir. 1995). To make this *de minimis* showing, "proving that a robbery depleted the assets of a business engaged in interstate commerce will suffice." *United States v. Curtis*, 344 F.3d 1057, 1070 (10th Cir. 2003). This is usually a simple inquiry since most Hobbs Act cases involve the robbery of a business, and businesses usually are either engaged directly in

interstate commerce or purchase or sell goods shipped in interstate commerce. *Bolton*, 68 F.3d at 398.

At trial, the district court allowed the prosecution to meet this requirement by having the jury determine whether the items Rutland was alleged to have stolen traveled in interstate commerce. The prosecution argued to the jury that it should do so because cash usually travels in interstate commerce and because Jerabek obtained his drugs from a source in Salt Lake City.

Rutland contends this jurisdictional test is inappropriate in his case because he robbed an individual, rather than a business, and individuals have a more tenuous connection to interstate commerce than most businesses. *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995). Although we have never considered this question, a majority of circuits do, in fact, require a more substantial showing that the robbery affected interstate commerce to sustain a Hobbs Act conviction when the victim is an individual. *See, e.g., United States v. Diaz*, 248 F.3d 1065, 1084–85 (11th Cir. 2001); *United States v. Min Nan Wang*, 222 F.3d 234 (6th Cir. 2000); *Quigley*, 53 F.3d at 910–11; *United States v. Collins*, 40 F.3d 95 (5th Cir. 1994); *United States v. Buffey*, 899 F.2d 1402 (4th Cir. 1990); *United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir. 1982); *but compare United States v. Lynch*, 437 F.3d 902, 909–12 (9th Cir. 2006) (rejecting the need for a heightened showing when the evidence establishes the crime had a direct effect on interstate commerce).

To sustain a Hobbs Act prosecution for robbing an individual, these circuits generally require a showing that (1) the victim was directly and regularly engaged in interstate commerce; (2) the crime somehow depleted the assets of a business engaged in interstate commerce; or (3) the number of victims or sums involved were so large there was a cumulative impact on interstate commerce. *Collins*, 40 F.3d at 100; *see also Diaz*, 248 F.3d at 1084–85; *Quigley*, 53 F.3d at 910–11. Rutland urges us to adopt this standard and argues the government did not meet that burden here.

Even if we were to adopt this standard, it is not clear how this helps Rutland. The government showed Jerabek was engaged in interstate commerce, albeit illicit commerce. So even if Jerabek was robbed as an individual, the government still produced enough evidence to meet the standard Rutland favors—namely, Jerabek was not merely a private citizen, but a drug dealer. While a majority of circuits have adopted a heightened standard for robberies of individuals, an even greater number of circuits have found that robberies of criminal organizations, even solo drug dealers, are robberies of businesses. *See United States v. Walker*, 657 F.3d 160, 182 (3d Cir. 2011), *cert. denied* 132 S. Ct. 1122 (2012); *United States v. Capozzi*, 486 F.3d 711, 726 (1st Cir. 2007); *United States v. Parkes*, 497 F.3d 220, 231 (2d Cir. 2007); *United States v. Ostrander*, 411 F.3d 684, 692 (6th Cir. 2005); *United States v. Rodriguez*, 360 F.3d 949, 955–56 (9th Cir. 2004); *United States v. Williams*, 342 F.3d 350, 355 (4th Cir.

2003); *United States v. Bailey*, 227 F.3d 792, 798–99 (7th Cir. 2000); *United States v. Box*, 50 F.3d 345, 353 (5th Cir. 1995). These cases generally reason that although drug businesses are illegal, they are still businesses and frequently operate in interstate commerce, and robbery still depletes their assets. *E.g., Walker*, 657 F.3d at 181–82.

The Tenth Circuit has not ruled definitively on this question, although we did hold in an unpublished opinion that robbery of an illegal drug trafficking business satisfies the interstate commerce requirement of the Hobbs Act. *United States v. Fields*, 157 F. App'x 40 (10th Cir. 2005). We see no reason to depart from the reasoning of these cases here. To satisfy the Hobbs Act's jurisdictional requirement, evidence must be adduced showing the illegal drug operation was engaged, either directly or indirectly, in interstate commerce and that the robbery depleted the assets of the drug operation. To that end, in this case the government produced evidence that Jerabek obtained his drugs from a source in Salt Lake City, Utah, and that the robbery deprived Jerabek of approximately a half pound of methamphetamine and between $24,000 and $30,000 in drug proceeds.

Rutland does not dispute this evidence, or the weight of the precedent holding that drug businesses, though illegal, are still businesses under the Hobbs Act. Instead, he argues the current situation is distinguishable because there is no evidence Jerabek was robbed *in his capacity* as a drug dealer. *See United States v. Moore*, 363 F.3d 631 (7th Cir. 2004), *overruled on other grounds by Young v.*

-11-

*United States*, 543 U.S. 1100 (2005). He asserts that the evidence established Jerabek was robbed to retrieve McIntosh's gun and money Jerabek owed Burnett, but not for his drugs or drug proceeds.

The problem with Rutland's argument is that there was ample evidence showing Jerabek was targeted, at least in part, in his capacity as a drug dealer. As we discuss when analyzing Rutland's hearsay claims, Rutland planned and executed the robbery with the help of David Burnett. Burnett was also a drug dealer, a rival of Jerabek's, and employed Rutland to sell drugs and collect debts. Burnett had loaned Jerabek $1800 and was never repaid, and also bought a large quantity of what turned out to be low-quality drugs from Jerabek. Burnett disliked Jerabek as a result, and stated while planning the robbery that he wanted what Jerabek owed him.

This evidence shows Rutland robbed Jerabek in part to collect on drug-related debts owed from Jerabek to Burnett. Although there was evidence Rutland also robbed Jerabek to retrieve McIntosh's gun, there is no evidence this was his only motive for robbing Jerabek, or that he did not intend to steal drugs and drug proceeds in the course of the robbery. Rutland knew Jerabek was a drug dealer, and that his home was likely to contain drugs and cash. And in the course of the robbery, he actually stole drugs and cash. This shows Jerabek was targeted, at least in part, in his capacity as a drug dealer.

And regardless of Rutland's motives, there is solid evidence, which he does not contest, that his crime actually depleted the assets of Jerabek's drug business, which was engaged in interstate commerce. *Curtis*, 344 F.3d at 1070. "[T]he effect on commerce of a Hobbs Act robbery may be shown by a reasonably probable effect on commerce, however minimal." *United States v. Shavers*, 693 F.3d 363, 373 (3d. Cir. 2012) (internal quotation omitted).

The evidence showed Rutland stole not only a gun but also a substantial amount of drugs, obtained from an out-of-state source, and cash, far more than the $1800 Jerabek owed Burnett. Jerabek was also unable to operate his business for approximately two months after the robbery due to the injuries he sustained. This sufficiently demonstrated the robbery depleted the assets of Jerabek's drug business, which operated across state lines, and thus met the *de minimis* showing needed to sustain a Hobbs Act violation. *Curtis*, 344 F.3d at 1070.

In summary, a rational jury could conclude from this evidence that Rutland's conduct satisfied the interstate commerce element of a Hobbs Act violation. In addition, because we do not vacate Rutland's conviction on Count Two, the Hobbs Act violation, we decline to vacate his conviction on Count Four, for use of a firearm during a violent felony. Rutland's only argument on Count Four was that the government could not prove he committed a robbery for which he could be prosecuted in federal court because his robbery of Jerabek did not

satisfy the interstate commerce element of the Hobbs Act.  Because we find it did,

we will not vacate his firearms charge.[2]

### *B.  Hearsay*

Rutland's second claim is that the district court improperly admitted

numerous out-of-court statements under the coconspirator exception, Federal Rule

of Evidence 801(d)(2)(E), when there was insufficient evidence of a conspiracy to

rob Jerabek.  The court admitted these statements provisionally, conditioning their

admission on the government's promise to develop proof of a conspiracy through

later testimony.[3]

---

[2]  During oral argument, Rutland's counsel raised another argument on this point, namely that if this robbery was committed pursuant to the drug conspiracy, and not to a separate robbery conspiracy, then his use of a firearm in conjunction with both the drug conspiracy and the robbery was such closely related conduct that we should reverse his conviction on Count Four.

Rutland made this argument at sentencing, but the district court ruled that regardless of whether the robbery was committed pursuant to the drug conspiracy or a separate conspiracy, the circumstances underlying each of Rutland's charges were factually distinct enough to support separate charges and sentences.  Rutland did not appeal this decision in his opening brief, and mentioned it only in passing in his reply brief.  We will not address his argument now, since we do not address arguments raised for the first time at oral argument.  *United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004) (citation omitted).  Even if we were to do so, it would not change the outcome, since we see no error in the district court's ruling regardless of whether the robbery and drug conspiracy were related.

[3]  This course of action is permissible, though "we have repeatedly mentioned 'our strong preference for *James* proceedings.'"  *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995)).

Rutland was charged with only one conspiracy, to possess and distribute methamphetamine. But at trial, the government argued and the district court found that there was a second, uncharged conspiracy to rob Jerabek.[4] The district court found that the declarants and Rutland were members of both conspiracies, and that the out-of-court statements Rutland complains of were made in the course of and in furtherance of these conspiracies. The court, however, did not specify which conspiracy each statement was in furtherance of. Rutland maintains that no robbery conspiracy existed, and that the statements were inadmissible pursuant to the drug conspiracy.

To admit an out-of-court statement as non-hearsay under the coconspirator exception, the district court must find by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and defendant were both members of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994). The court may consider both independent evidence and the statements themselves when making this finding. *United States v. Parra*, 2 F.3d 1058, 1069 (10th Cir. 1993).

---

[4] The conspiracy supporting the introduction of the out-of-court statement need not be the same as the conspiracy charged in the indictment, so long as the statement was in furtherance of the uncharged conspiracy. *United States v. Gigante*, 166 F.3d 75, 82 (2d. Cir. 1999); *see also United States v. Evans*, 970 F.2d 663, 675 (10th Cir. 1992) (holding that a failure to instruct the jury on additional uncharged conspiracies is not reversible error so long as the jury is instructed that the government has the burden to prove the charged conspiracy).

*1. Drug Conspiracy*

Rutland does not contest the existence of the drug conspiracy. Rather, he argues the many out-of-court statements he complains of were not made in furtherance of the conspiracy because they pertained to the robbery.

Rutland asserts that the robbery was not related to the drug conspiracy, so any plans or statements made about the robbery cannot have been in furtherance of the drug conspiracy. But as we discussed when analyzing Rutland's Hobbs Act offense, there is evidence linking the robbery to the drug conspiracy. This evidence showed Burnett, who was heavily involved in planning the robbery, had a prior business relationship with Jerabek. Burnett had loaned Jerabek $1800, which Jerabek never repaid.[5] Burnett also purchased a large quantity of drugs from Jerabek that turned out to be of very low quality. Burnett severed his relationship with Jerabek after this. Rutland sold drugs and collected debts for Burnett. Although there was no evidence any of the coconspirators specifically stated they were targeting Jerabek to damage his business, Burnett did say while planning the robbery that he wanted what Jerabek owed him. The district court could have inferred from this evidence that one purpose of the robbery was to collect drug debts Jerabek owed Burnett.

---

[5] Burnett testified at one point that he had forgiven the debt when Jerabek gave him some property in lieu of the money, but he also told numerous people that Jerabek never paid him back and owed him money.

Rutland's sole response to this evidence is to argue the robbery was not a reasonably foreseeable consequence of the drug conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 188 (1987) (holding an individual who acts outside the scope of a conspiracy cannot bind his coconspirators). He maintains that the drug conspirators agreed merely to buy and sell meth, not to commit robberies or retaliate against their competition. He also argues the robbery did nothing to further or promote the drug conspiracy.

Rutland is correct that the commission of a robbery cannot necessarily be inferred from an agreement to distribute drugs. But he goes too far in suggesting that the robbery did nothing to promote the drug conspiracy. On the contrary, the robbery aided Burnett's drug operation by allowing him to recover money owed him by Jerabek or that he lost as a result of prior bad business deals with Jerabek. The evidence showed that several individual drug conspirators, including Medved, Burnett, and Rutland, obtained money or drugs as a result of the robbery, allowing them to increase their drug distribution activities.

"Because it is difficult to distinguish between a single large conspiracy and several smaller conspiracies, we will generally defer to the [trier of fact's] determination of the matter." *United States v. Fishman*, 645 F.3d 1175, 1189 (10th Cir. 2011), *cert. denied* 132 S. Ct. 1046 (2012) (internal quotation omitted). The district court found two separate conspiracies, one to distribute drugs and one to rob Jerabek, but it never found these conspiracies were completely unrelated.

To the contrary, the evidence shows the two conspiracies were closely related.  In fact, the robbery conspiracy can probably best be described as a sub-conspiracy of the drug conspiracy, as it involved many of the same members and its goals, at least in part, were to further the aims of the drug conspiracy.

The fact that the goals of the two conspiracies were not perfectly aligned does not preclude a finding that they were related.  "The goals of all the participants need not be congruent for a single conspiracy to exist, *so long as their goals are not at cross purposes. . . .*"  *Fishman*, 645 F.3d at 1190 (quoting *United States v. Harrison*, 942 F.2d 751, 756 (10th Cir. 1991) (internal quotation omitted)).  Similarly, the goals of the two conspiracies here need not be perfectly aligned for the conspiracies to be related.

As Rutland argues, the fact that there were two conspiracies, and not one, with somewhat different goals, suggests that some conspirators might belong to one conspiracy and not the other, or some statements may have been made in furtherance of one but not the other.  But we cannot make a blanket finding that no statements pertaining to the robbery were made pursuant to the drug conspiracy, or conversely that all such statements were.

In short, we will evaluate the statements individually to determine whether the district court's decision to admit them was an abuse of discretion.

## 2. *Robbery Conspiracy*

Although Rutland concedes the existence of the drug conspiracy, he disputes that the evidence supports the existence of a separate robbery conspiracy. To prove a conspiracy existed, the district court must find by a preponderance of the evidence that (1) there was an agreement to violate the law, (2) the declarant knew the essential objectives of the conspiracy, (3) the declarant knowingly and voluntarily took part in the conspiracy, and (4) the coconspirators were interdependent. *United States v. Ailsworth*, 138 F.3d 843, 850–51 (10th Cir. 1998). Rutland disputes that the evidence established the first and fourth factors, the existence of an agreement and interdependence.

*Agreement.* To prove the existence of an agreement, the government does not have to prove an express or formal agreement was made. *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990). It merely has to show the coconspirators "tacitly came to a mutual understanding." *Id*.

The evidence of an agreement was as follows: (1) Burnett and Rutland discussed robbing Jerabek numerous times; (2) O'Connell and McIntosh were involved in some of these discussions; (3) McIntosh and Rutland attempted to rob Jerabek on a prior occasion, but called off the robbery when they found Jerabek's girlfriend at his house; and (4) O'Connell suggested to the others that they steal more than McIntosh's gun from Jerabek.

Rutland dismisses this evidence as mere "narrative declarations" or "idle chatter" that is insufficient to establish the existence of an agreement. *United States v. Doerr*, 886 F.2d 944, 951–52 (7th Cir. 1989). But while Burnett said his discussions with Rutland "weren't plots and plans" but "just comments," R., Vol. 3, at 617, no other witness described these statements as speculative or unserious. Rutland certainly took them seriously. Rather, the statements seem to be exactly what they purport—discussions of how to rob Jerabek.

These statements do not necessarily demonstrate the existence of an explicit agreement to rob Jerabek, but they are sufficient to show the existence of tacit, mutual understanding. *See United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007) (inferring an agreement based on frequent contacts among the defendants and joint actions). Thus, the district court did not clearly err by finding the existence of an agreement.

*Interdependence*. We will find interdependence is present if the declarant's actions facilitated the actions of other coconspirators or the venture as a whole. *United States v. Powell*, 982 F.2d 1422, 1432 (10th Cir. 1992). We also consider whether the activities of the alleged coconspirators were advantageous to the activities of other coconspirators, or the success of the venture as a whole. *United States v. Carnagie*, 533 F.3d 1231, 1240 (10th Cir. 2008). There must be proof of affirmative conduct in furtherance of the conspiracy, not merely

association.  *Id*. at 1429.  The government may demonstrate interdependence using circumstantial evidence.  *Caldwell*, 589 F.3d at 1329.

The evidence of interdependence was: (1) Burnett, Rutland, McIntosh, and O'Connell discussed robbing Jerabek on numerous occasions; (2) Rutland and McIntosh went to Jerabek's intending to rob him, but called off the plan when they found Hundley there; (3) either Rutland or Burnett called Medved the night of the robbery to tell him to get his mother out of Jerabek's house; (4) Burnett suggested O'Connell ask Rutland to help him rob Jerabek; and (5) Burnett offered to help Rutland rob Jerabek.

This shows the coconspirators did more than speculate about the possibility of robbing Jerabek, but actually planned a robbery.  Although none of the other coconspirators helped Rutland commit the robbery, only one coconspirator need commit an overt act in furtherance of the conspiracy to establish its existence. *See United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009).

We examine this evidence in more detail below, when discussing whether it supports each individual alleged coconspirator's involvement in the conspiracy. But because the evidence shows affirmative conduct in furtherance of the conspiracy, beyond mere association, the district court did not err when it concluded a robbery conspiracy existed.

*3. Coconspirators*

We must next determine whether the district court's finding that the declarants whose out-of-court statements were admitted were members of a conspiracy was correct. Rutland objected to out-of-court statements made by four individuals: Burnett, Medved, McIntosh, and O'Connell. He acknowledges that each of these men was a member of the drug conspiracy, but disputes the men were also members of the robbery conspiracy.

A person is a member of a conspiracy if he was aware of the common purpose, willingly participated in the conspiracy, and intended to advance the purpose of the conspiracy. *United States v. Suntar Roofing*, 897 F.2d 469, 474–75 (10th Cir. 1990).

*Burnett*. Rutland argues Burnett was not a robbery conspirator because he testified he had no part in Jerabek's robbery and said his discussions with Rutland about robbing Jerabek weren't "plots and plans." R., Vol. 3, at 617. Burnett's attempt to distance himself from the robbery is undermined by other testimony, including his own, that he participated in numerous discussions about the robbery, wanted to recover money from Jerabek through the robbery, offered to help with the robbery, and suggested the coconspirators involve Rutland in the conspiracy. Burnett's involvement in planning the robbery from the very beginning demonstrates not only that he was aware of the conspiracy and its purpose but also intended to advance its purpose. His central role in planning the robbery

-22-

convinces us the court did not err in concluding he was a robbery coconspirator. Thus, Burnett was a member of both conspiracies.

*McIntosh*. We can also conclude McIntosh was a robbery conspirator. He participated in several discussions about the robbery and participated in a failed robbery attempt with Rutland. Nor does Rutland seriously argue McIntosh was not a coconspirator.[6] Thus, he was also a member of both conspiracies.

*O'Connell*. Several witnesses testified that O'Connell participated in planning the robbery. O'Connell apparently did not take overt action until after the robbery occurred, when he helped Rutland cover up the crime. But given the evidence of O'Connell's involvement in planning the robbery, he was obviously aware of its purpose and intended to advance it. *Suntar Roofing*, 897 F.2d at 474–75; *see also United States v. Fox*, 902 F.2d 1508, 1517 (10th Cir. 1990). O'Connell consequently was a member of both conspiracies.

*Medved*. The government argued at trial that Medved was a member of the robbery conspiracy, but the district court sustained an objection to testimony about certain statements Medved made concerning his role in the robbery on the grounds that Medved acted primarily out of concern for his mother's safety, not because he wished to help the others rob Jerabek. On appeal, the government

---

[6] Rutland argues McIntosh was not a coconspirator because the only evidence was that he retrieved Rutland's gun after the robbery. Rutland seems to be confusing McIntosh with Campbell, who retrieved Rutland's gun. We agree the evidence is insufficient to support Campbell's involvement in the robbery conspiracy, but the government does not argue he was a coconspirator.

does not argue this ruling was incorrect, and in fact concedes Medved did not overtly facilitate the robbery. But it also argues Medved's actions on behalf of the drug conspiracy contributed to the robbery's success because he kept its existence a secret and removed his mother from Jerabek's house prior to the robbery. The evidence also showed Medved participated in some planning discussions, did not warn Jerabek about the robbery despite his close relationship with Jerabek, and removed his mother from Jerabek's house on the night of the robbery, all of which facilitated the robbery conspiracy's success and demonstrated that Medved was aware of the robbery conspiracy's purpose and participated in it to some degree. *Suntar Roofing*, 897 F.2d at 474–75.

Nonetheless, the government does not contest the district court's ruling on appeal and concedes Medved took no overt actions on the robbery conspiracy's behalf.

*4. Statements*

We now turn to the out-of-court statements Rutland alleges were improperly admitted. To be admissible under Rule 801(d)(2)(E), a statement must be made by a coconspirator and be in furtherance of the conspiracy. *United States v. Roberts*, 14 F.3d 502, 515 (10th Cir. 1993). A statement is in made in furtherance of a conspiracy when it is "intended to promote the conspiratorial objectives." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation omitted). We have found the following sorts of statements to

-24-

be in furtherance of a conspiracy: (1) statements explaining events of importance to the conspiracy, *id*.; (2) "statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy," *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987) (internal quotation omitted); (3) statements identifying a fellow coconspirator, *Townley*, 472 F.3d at 1273; and (4) discussions of future intent "that set transactions to the conspiracy in motion" or that maintain the flow of information among conspiracy members, *United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995). Mere "narrative declarations of past events," however, are not in furtherance. *Gutierrez*, 48 F.3d at 1137.

The majority of the out-of-court statements Rutland complains of were made by Burnett. Medved testified (1) he heard Burnett and Rutland discuss robbing Jerabek, (2) either Rutland or Burnett called him the night of the robbery saying "tonight's the night," (3) Burnett told Medved the morning after the robbery that Jerabek had been shot, and (4) Burnett told Medved Rutland would pay him to keep quiet about the robbery. Medved's girlfriend testified (5) she heard Burnett, Rutland, and O'Connell discuss robbing Jerabek to get money Jerabek owed them. Jesse Winner testified Burnett told him (6) to dispose of a bag, (7) to burn a photo album stolen from Jerabek, and (8) that popping sounds from the burning bag of evidence might be .22 shells.

Statements 1, 2, and 5 did not pertain directly to the drug conspiracy, but were in furtherance of the robbery conspiracy. Either they were made by Rutland, in which case they were admissions against interest under Rule 801(d)(2)(A), or they were made by Burnett, who was a member of the robbery conspiracy. In either case, they were admissible.

Statements 3, 4, and 8, on the other hand, may not necessarily be admissible pursuant to the robbery conspiracy. They occurred after the robbery, by which point that conspiracy had ended. *United States v. Silverstein*, 737 F.2d 864, 867 (10th Cir. 1984). But these statements were made in furtherance of the drug conspiracy. Statement 3 was made to inform Medved, who was a drug conspirator, of the status of the robbery. The robbery, as discussed, was intended in part to further the objectives of the drug conspiracy, and updating Medved on it served to maintain the flow of information among the coconspirators. *Townley*, 472 F.3d at 1273. Similarly, statement 4 informed Medved that he would benefit in the drug conspiracy if he helped conceal the existence of the robbery. Statement 8 was to Winner, who sold drugs for Burnett and was a member of the drug conspiracy, and Burnett's statement maintained the flow of information to Winner and helped him safely dispose of the robbery evidence, which furthered the goals of the drug conspiracy. Accordingly, these statements were admissible pursuant to the drug conspiracy.

Statements 6 and 7 were admissible: they were instructions and were not offered for their truth. *Thornburg v. Mullin*, 422 F.3d 1113, 1128 (10th Cir. 2005). Thus, it is irrelevant which conspiracy they were made in furtherance of.

The remaining out-of-court statements Rutland claims were admitted in error were all testified to by Burnett. Burnett testified (1) Medved asked Burnett and Rutland for time to get his mother out of Jerabek's house; (2) O'Connell said he was going to rob Jerabek, asked whether Burnett wanted anything, and speculated Burnett would be blamed for the robbery; (3) O'Connell told Burnett he wanted to transform McIntosh's plan to steal his gun back from Jerabek into a full-blown robbery; (4) O'Connell told Burnett he and Rutland were going to rob Jerabek; and (5) McIntosh said he was going to get his gun from Jerabek.

Each of these statements except the first was admissible because it was made by a coconspirator and was in furtherance of the robbery conspiracy. The government concedes the last statement, by McIntosh, might not have been made in furtherance of the conspiracy, but argues even if it was not, the statement was not offered for its truth—that McIntosh wanted to retrieve his gun from Jerabek—but as res gestae evidence to demonstrate how the conspiracy began and so was not hearsay under Rule 801(c)(2). *See United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995). We agree with this explanation; thus, it was not error to admit it. *United States v. Tome*, 61 F.3d 1446, 1449 (10th Cir. 1995) (noting appellate

courts may affirm evidentiary rulings under any Federal Rule of Evidence, not just the one relied on at trial).

As for the first statement, by Medved, it was arguably in furtherance of the robbery conspiracy, but it was nonetheless inadmissible pursuant to that conspiracy because Medved was not a robbery coconspirator. But Medved was a drug coconspirator, and we find the statement was also in furtherance of the drug conspiracy. Although Medved did not agree with the others to rob Jerabek, he nonetheless facilitated the robbery in a variety of ways in order to maintain his status as a drug conspirator and to aid the goals of the drug conspiracy, which the robbery was intended to advance.

As discussed, he concealed the existence of the conspiracy from Jerabek, despite his long history with Jerabek and his mother's close relationship with Jerabek. More importantly, he asked for a warning so he could remove his mother from Jerabek's prior to the robbery. Although this was primarily for personal reasons, it also helped the robbery and drug conspiracy succeed, and maintained Medved's status in the drug conspiracy. *Smith*, 833 F.2d at 219. Hence, this statement was admissible pursuant to the drug conspiracy.

Finally, we note that many of the out-of-court statements Rutland complains of were made by Burnett and Medved, who both testified at trial and were cross-examined by Rutland's attorney. We have held that any error in admitting coconspirator hearsay statements is harmless when the declarant

-28-

testifies at trial and is subject to cross examination about the statements. *Townley*, 472 F.3d at 1274; *United States v. Gary*, 999 F.2d 474, 479 (10th Cir. 1993) (citing *United States v. Wolf*, 839 F.2d 1387, 1395–96 (10th Cir. 1988)); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."). Both Burnett and Medved testified and were cross-examined about the subjects of each of these statements, so even if they were admitted in error, their admission was harmless.[7]

## III. Conclusion

For the foregoing reasons, we AFFIRM Rutland's convictions.

---

[7] This rule would not apply to statements by O'Connell, who did not testify at trial, or McIntosh, who died prior to Rutland's trial, but as discussed, all out-of-court statements by these men were properly admitted.